IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

_____

| | | |
|---|---|---|
| KELLY D. WORTHAN, | ) | Cause No. CV 11-48-M-DWM-JCL |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND RECOMMENDATION |
| | ) | OF U.S. MAGISTRATE JUDGE |
| WARDEN SAM LAW; | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF MONTANA, | ) | |
| | ) | |
| Respondent. | ) | |

_____

On March 23, 2011, Petitioner Kelly Worthan moved to proceed in forma pauperis with this action for a writ of habeas corpus under 28 U.S.C. § 2254. Worthan is a state prisoner proceeding pro se.

Following the Order of April 6, 2011, the State, on April 13, 2011, filed the transcripts of Worthan's pretrial hearings, trial, sentencing, and postconviction hearings in state court.

## I. Background

Worthan was charged in Montana's Twenty-First Judicial District Court with two counts of sexual intercourse without consent, two counts of incest, and one count

1

of tampering with a witness.

Trial commenced on June 14, 2005. Kelli Sather was appointed to represent Worthan at trial. Except where a conflict in the evidence is described, the following facts were uncontested.

On a Saturday night in April 2003, nine-year-old "Jane"[1] was staying overnight at the home of her friend, "Ann." Jane described to Ann sexual acts that her father made her perform. Ann told her mother. Ann's mother was skeptical because Jane's behavior was not what she expected of a child disclosing sexual abuse. Trial Tr. at 346:2-20, 372:8-372:23, 720:21-724:14, 1343:16-1344:9, 1346:16-1347:21.

The next morning, Sunday, Ann's mother called Jane's mother, "Nancy," and asked her to come over. At Ann's house, Nancy talked briefly to Jane, Ann's mother, and Ann. Jane moved quickly from tearfulness to going back to playing with Ann. Both mothers testified they were skeptical, given the apparent mismatch between Jane's statements and her behavior, and they talked about what to do. Nancy told Ann's mother she intended to contact the school counselor to learn what resources were available to deal with the situation. Nancy testified that she made an appointment to talk with the school counselor on Wednesday at noon. Id. at 725:5-728:22, 753:25-754:24, 1112:9-1117:11.

---

[1] Non-identifying names are used.

Worthan first heard of Jane's statements on a Tuesday evening a week or two later, when he retrieved a phone message to Nancy from Ann's mother, asking whether Nancy had talked to anyone about Jane. Nancy then told Worthan that Jane said he had sexually abused her. She also told Worthan that she was going to contact the school counselor. Worthan drove Jane, her eight-year-old sister "Lisa," and their younger brother "Scott" home from a school event that evening. He asked Jane whether she had been telling stories, and she said no. He testified that he and Nancy sat down with Jane later that night and explained to her that Mommy and Daddy could go to jail if she continued saying he did bad things to her. Id. at 1117:12-1119:9, 1285:18-1292:1.

Nancy testified that she met on Wednesday with the school counselor, who promised to get back to her with names of professionals who could help. Nancy also said the counselor did not follow through. Trial Tr. at 1119:21-1120:18.

On Friday, April 25, 2003, Ann's mother, who was required to report any allegation of abuse of a child, contacted the Department of Family Services because she came to believe Nancy would not do anything. A DFS worker, Shelly Verwolf, went to the school to talk to Jane, but Jane was not in school that day. Id. at 728:23-730:20, 936:21-937:7.

The following Monday afternoon, Verwolf briefly interviewed Jane at school.

Jane was very distressed when she described what her father did. She also told Verwolf of physical abuse. Based on what Jane said and on other information,[2] Verwolf removed Jane, Lisa, and Scott from school and drove all three children to the police station. Trial Tr. at 936:10-943:10.

Verwolf and Stevensville Police Chief Lew Barnett interviewed Jane and Lisa on videotape; the jury saw Jane's tape at trial. Id. at 943:16-20, 1376:12-1377:1. Barnett called Jane's home. Worthan, who had a nighttime work schedule and was just getting out of the shower, answered the phone. Barnett asked for Nancy, told her there was a problem with one of the children, and asked her to come down to the station right away. Nancy went while Worthan finished dressing. Id. at 945:3-25, 1120:19-1122:4, 1295:20-1297:13.

Verwolf and Barnett interviewed Nancy. Verwolf left the room about ten or fifteen minutes into the interview, headed back to the room where the children were waiting, and saw Worthan coming out of the room with Scott.[3] Verwolf told Worthan

---

[2] On March 14, 2003, "Sherry" reported to DFS that Worthan had sexually abused her and two other girls, including a blood relative, twenty years before, when they were Jane's and Lisa's age and Worthan was nine to eighteen years old. Sherry decided to make the call because she was concerned about Worthan's daughters. Sentencing Tr. at 38:11-41:10. No information about that report came into evidence at trial.

[3] Stevensville's police department is very small. It would not be unusual if no other officers were available to stay with the children while Chief Barnett and

4

he could not take the children. She took Scott to rejoin his sisters. When she entered the children's room, Jane was huddled in her chair, crying. Verwolf said that Jane told her that Nancy had said she was mad at her and Worthan told her she needed to tell the police what she was saying was not true. Worthan explained that he made that statement to Jane on the evening when he first heard of Jane's allegation, not at the police station. Trial Tr. at 946:6-949:21, 1297:16-1301:4, 1290:20-1291:4.

Verwolf put the children into foster care for a two-day investigatory period. Forensic medical examinations of the children were inconclusive. Id. at 662:4-16, 677:5-6, 679:6-682:8. A forensic psychologist, Dr. Miller, interviewed Jane, who described incidents of sexual abuse. Id. at 820:4-821:2. Dr. Miller also interviewed Lisa, who did not disclose any abuse. Id. at 833:5-7. In later sessions with a therapist, Dr. Ruggiero, Lisa began to describe abuse, id. at 483:3-7, and Jane described additional incidents, id. at 487:6-15. Nancy testified that what Jane told her at Ann's house was not similar to what was later alleged. Id. at 1113:17-21. Ann's and Ann's mother's testimony differed from Nancy's on that point, id. at 722:10-11, 725:24-726:5, 1346:16-21. Nancy was the only witness who described Jane's allegations using the term "pee-pee."

Sather called David Stube as an expert witness to respond to Dr. Miller's and

_____

Verwolf were interviewing Nancy or one of the children.

Dr. Ruggiero's assessments of the girls' behavior. His testimony was, in a word that will be repeated frequently in this Order, a disaster. The trial court found he was not qualified to testify and excused him.[4] Though Sather had identified Dr. Michael Scolatti as an expert witness to rebut Dr. Miller's testimony, she did not call him.

The jury convicted Worthan on all counts. On November 16, 2004, he was sentenced to serve sixty years, with thirty suspended on each count of sexual intercourse without consent, with those terms to run consecutively; sixty years with thirty suspended on the two incest counts, to run concurrently; and ten years for witness tampering, consecutive, for a total of 130 years in prison, with sixty suspended.

Represented by new counsel, Worthan appealed, arguing two issues he does not raise here. The Montana Supreme Court affirmed his convictions. State v. Worthan, 138 P.3d 805, 811 ¶¶ 28-30 (Mont. 2006).

Again represented by new counsel, Worthan filed a petition for postconviction relief in the trial court. He argued that counsel was ineffective because she told the jury in her opening statement that she would call Dr. Scolatti but did not call him and

---

[4] Based in part on Stube's pretrial evaluations of the girls, Sather was able to obtain evidence and testimony from the girls' teachers and from their foster mother that Jane and Lisa sometimes told lies. She was also able to demonstrate that the girls received positive reinforcement for their allegations.

because she did not verify Stube's qualifications. The trial court denied the petition.

Worthan appealed. The Montana Supreme Court held that Worthan was not

prejudiced by counsel's opening statement because her reference to Scolatti was brief

and did not imply that he was central to the defense. Worthan v. State, 232 P.3d 380,

384 ¶ 16 (Mont. 2010). It also held that Stube's exclusion was not the result of

deficient performance. The court said that Sather "performed her duties in a manner

consistent with her responsibilities as defense counsel," but Stube "glossed over or

even mislead [sic] Sather as to the status of his Ph.D." Id. at 384-85 ¶ 20.

In October 2010, Worthan filed a petition for writ of habeas corpus in the

Montana Supreme Court. He asserted prosecutorial misconduct in the State's closing

argument. The Montana Supreme Court dismissed the petition because habeas relief

is not available under state law to challenge the validity of a conviction. Order at 2,

Worthan v. Law, No. OP 10-0511 (Mont. Nov. 10, 2010) (Pet. Ex. 5 (doc. 1-1 at 28));

Mont. Code Ann. § 46-22-101(2).

Although Worthan is not entitled to tolling for the time period his state habeas

petition was pending, Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005), his federal

petition was nonetheless timely filed on March 23, 2011. 28 U.S.C. § 2244(d)(1)(A),

(2); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999).

## II. Worthan's Allegations

First, Worthan alleges that the prosecution made comments in closing arguments that impermissibly shifted the burden to him. He claims prosecutorial misconduct, ineffective assistance of counsel for failure to move for mistrial, and ineffective assistance of appellate counsel for failure to raise the issue. Pet. at 4 ¶ 15A, 6 ¶ 15D, 7 ¶ 15D(5), 9.

Second, Worthan alleges that counsel was ineffective because she failed to call Dr. Scolatti as a witness and because she failed to verify Stube's qualifications. Id. at 5 ¶¶ 15B-C, 10-18.

### III. Analysis

### A. Prosecutor's Remarks in Closing Argument

Worthan claims the prosecution made remarks in closing argument that shifted the burden to him to prove his innocence. This claim was not fairly presented to the Montana courts. Mont. Code Ann. § 46-22-101(2); Lott v. State, 150 P.3d 337, 342-43 ¶¶ 22-23 (Mont. 2006); Castille v. Peoples, 489 U.S. 346, 351 (1989); Pitchess v. Davis, 421 U.S. 482, 488 (1975) (per curiam); Ex parte Hawk, 321 U.S. 114, 116 (1944) (per curiam). But there is no need to delay its resolution. 28 U.S.C. § 2254(b)(2).

Nancy testified that she did not believe Jane and that she spoke with the school counselor about the situation because she viewed Jane's story as a problem to be

8

addressed by the whole family with professional help. She also said that Worthan agreed with this approach. Trial Tr. at 115:19-1117:11, 1119:18-1120:18, 1147:23-1148:10. Worthan testified similarly. Id. at 1292:9-1293:4. Thus, Worthan presented evidence that he and his wife acted together as mature and honest parents with respect to their children. Id. at 1416:8-14, 1430:4-11. Though it should have been an easy matter to locate and call the school counselor to corroborate Nancy's call, the defense did not do that. The prosecutor pointed out this lack of corroboration in his rebuttal to the defense's closing argument:

> [Y]ou have the right to ask yourself questions. You have the right to say, Show me.
>
> An example that comes to mind: As soon as we found out about this, we got right with the school counsellor [sic passim]. We were going to take care of finding out what was wrong.
>
> You have the right to ask yourself, Where the heck was the school counsellor in this trial? You have the right to say, Don't come in here and tell me you did something when you have a very easy way to otherwise show me that you did it. Where was the school counsellor?
>
> The second one that came to mind – I made a note of it. My brain is not that good anymore, so – Oh, inconsistency after inconsistency after inconsistency. Show me. Don't get up here and tell us these girls are inconsistency after inconsistency after inconsistency. Show it to me.

Trial Tr. at 1434:21-1435:15.

First, when a defendant chooses to present evidence, it is fair for the prosecution to comment on its meaning, its credibility, its corroboration, or its lack of those qualities. The Fifth Amendment prohibits any comment by a prosecutor on

a defendant's failure to testify, <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965), but the Fifth Amendment is not implicated when a prosecutor comments on a failure by the defense to present exculpatory or corroborative evidence, <u>Cook v. Schriro</u>, 538 F.3d 1000, 1020 & n.9 (9th Cir. 2008).

Second, it is extremely unlikely that the jury took the prosecutor's comments as shifting the burden to the defendant. The jury was instructed at the beginning of the case that the State had the burden of proving guilt beyond a reasonable doubt, that the defendant must be presumed innocent, and that "[t]he defendant is not required to prove his innocence or present any evidence." Trial Tr. at 230:14-231:5.[5] The concept was also discussed in voir dire. <u>E.g.</u>, <u>id.</u> at 194:16-24. Calling attention to the absence of a corroborating witness named by the defendant's own witnesses simply does not amount to a demand that the defendant prove himself innocent.

Finally, it is highly unlikely that the prosecutor's comment played any role, much less a substantial and injurious one, <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993), in the verdict. Worthan was convicted because the jury believed Jane, Lisa, the doctors who evaluated and treated them, and the other prosecution witnesses, and because it did not find Nancy's and Worthan's testimony credible.

---

[5] This instruction may or may not have been repeated after the close of the evidence. Final jury instructions were not reported. Trial Tr. at 1396:22-1397:5.

There was no burden-shifting, the prosecutor's closing argument did not violate the Constitution, and, at any rate, Worthan was not prejudiced. Because Worthan does not show prosecutorial misconduct, he also cannot support the derivative ineffective assistance claims. His first ground for relief should be denied.

**B. Ineffective Assistance of Trial Counsel**

Claims of ineffective assistance are governed by Strickland v. Washington, 466 U.S. 668 (1984). Worthan must show both that counsel's performance fell below an objective standard of reasonableness, id. at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[T]here is no reason . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." Id. at 697.

**1. Dr. Scolatti**

Worthan claims that trial counsel prejudiced him by telling the jury she would call Dr. Michael Scolatti as a witness and then failing to do so.

In his postconviction appeal, Worthan argued that Sather was ineffective because she knew Dr. Scolatti's testimony might be inadmissible under State v. Bailey, 87 P.3d 1032, 1038-39 ¶¶ 34-39 (Mont. 2004), but she recklessly "promised" the jury she would call him. See generally Opening Br. at 9-15, Worthan v. State, No.

DA 09-503, 2009 WL 3601973 (Mont. Oct. 26, 2009).

In this Court, Worthan argues, instead, that he was prejudiced because the jury did not hear what Dr. Scolatti had to say. E.g., Pet. at 12.

In the first instance, the problem is the falsity of the promise, in the latter, the absence of the evidence. Worthan's claim in this Court therefore was not properly exhausted in the state courts because he is not presenting the same "operative facts" here. Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008). For the sake of being thorough, however, both claims will be addressed.

*a. Worthan's Claim in State Postconviction Proceedings*

Because the Montana Supreme Court considered the merits of this claim, Worthan may obtain relief only if its denial "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The Montana Supreme Court said:

[F]ar from punching holes in the State's case, Dr. Scolatti's testimony during sentencing actually supported the conclusion that the State forensic interviews were conducted in a professional and proper manner. Furthermore, we are not persuaded by Worthan's contention that he was prejudiced by reference to Sather's unfulfilled promise to call Dr.

12

Scolatti in the State's closing and rebuttal arguments. Having sifted through the transcripts we find no reference in the State's closing or rebuttal arguments to either Dr. Scolatti or Sather's unfulfilled promise to call him as an expert witness.

Worthan, 232 P.3d at 384 ¶ 16.

In her opening statement, counsel said:

You will also hear from Dr. Scolatti, who reviewed the forensic interviews and has worked with children and done this, and he comes to a little different conclusion than Dr. Miller. He may agree with some of the techniques she used; but in reviewing the videotapes and a lot of other information, he comes to a different conclusion on what he thinks the outcome of [Jane's] interview was.
. . .
    The main thing you will hear here is a lack of emotion, and that is one of the things you'll hear Dr. Scolatti testify to also. This has been a constant theme – the lack of emotion and why these children, if this had occurred, are behaving the way they are. It doesn't add up.

Trial Tr. at 248:15-25, 250:11-17.[6]

Sather's opening statement takes up seventeen transcript pages. The nineteen

lines quoted here contain everything she said about Dr. Scolatti. Eight of these lines

---

    [6] Neither postconviction counsel nor the State asked Sather why she did not call Dr. Scolatti or whether she considered asking for a continuance to obtain the presence of a witness who went to Portland, Oregon, despite having been subpoenaed. Sather may reasonably have decided not to call Dr. Scolatti after the State's witnesses described quite a lot of emotion, and of course the girls themselves testified for the jury. Or perhaps Sather reasonably decided that Dr. Scolatti's testimony was not worth its potential cost after it became clear she would not be able to link it with Stube's. All this by way of saying that, in addition to lack of prejudice, it is not established that Sather performed unreasonably.

are actually focused on Stube, with Dr. Scolatti mentioned only in passing. Sather did not make Dr. Scolatti the centerpiece of her case. She did not even characterize his anticipated testimony as decisive. She said Dr. Scolatti's conclusion was "a little different" and "different," not "contrary" or "opposite" to Dr. Miller's. By contrast, there were three or four people who actually knew what happened – Jane, Lisa, possibly Nancy, and, most importantly, Worthan himself. They all testified.

The Montana Supreme Court's decision was not unreasonable. It is not reasonably probable that Worthan would have been acquitted if only Sather had not told the jury she would call Dr. Scolatti. This claim should be denied.

### b. Worthan's Present, Unexhausted Claim

Dr. Scolatti could not testify that the girls were not credible, but he could have testified to the same issues as Dr. Miller. E.g., Trial Tr. at 8:10-17, 10:21-11:4, 11:21-25, 12:8-19, 13:13-16, 451:2-5. Worthan argues, in effect, that Sather should have called Dr. Scolatti to testify.

Postconviction counsel did not show what Dr. Scolatti would have said if called as a witness to rebut Dr. Miller's testimony. Sather did not make or ask leave to make an offer of proof at trial. Worthan had every opportunity to develop the factual basis of his claim by showing what Dr. Scolatti would have said if called to testify. He failed to do so. Therefore, 28 U.S.C. § 2254(e)(2) applies.

There is no new constitutional rule at issue, nor could Worthan hope to show that what Dr. Scolatti would have said "could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(i), (ii). Therefore, he is not entitled to a hearing in this Court to introduce testimony from Dr. Scolatti.

Consequently, all that may be considered is Dr. Miller's testimony and the traces of Dr. Scolatti's 2003 pretrial report that were discussed at sentencing. At trial, Dr. Miller testified about the manner of her interview, e.g., Trial Tr. at 818:1-820:3; reported some of what Jane did and said in the interview, e.g., id. at 820:12-18; explained what she would expect from a child who experienced abuse one or multiple times or not at all, e.g., id. at 821:3-822:7; explained some of what she thought Jane meant by what she said or why there might be slight differences in her descriptions as time went on, e.g., id. at 826:6-20; and explained why she rejected certain alternative hypotheses for the source of Jane's statements and information, e.g., id. at 828:16-830:1. She also explained why she was not surprised that Lisa did not disclose any sexual abuse during the forensic interview but did so later. Id. at 833:8-835:3.

Dr. Scolatti said Dr. Miller "did the forensic interview in the proper manner." Sentencing Tr. at 19:5-6. He "didn't find anything" in Dr. Miller's interview "that demonstrated distortion, bias, or expectancy errors." Id. at 19:2-3. He found no

15

motivation for Jane to make a false allegation.  Id. at 19:18-22.  He agreed that "it's rare for two children [to] make up a false allegation," id. at 18:14-15, and both girls were at an age where false allegations are rare, id. at 18:17-19.  He found that Jane's disclosure to "her teacher"[7] was "consistent with actual abuse victims."  Id. at 19:15. And he said "it's almost impossible for a child [Jane's] age to describe the texture of ejaculate without experiencing the substance."  Id. at 19:9-11.

This last observation would have been particularly unhelpful to Worthan in light of Dr. Miller's trial testimony:

Q.   What did you observe about [Jane] that was nonverbal?

A.   The most striking was her facial expression of disgust whenever she talked about the slimy, gooey substance, and she just looked like she was repulsed.  That happened every time, and it seemed to be a very visceral, very body reaction when she was talking about that.
         That is something I would not expect a child her age to be able to fabricate, nor in such – if somebody coached her to do that, I think it would be difficult to coach a child who wasn't a trained actress in how to do that with the correct timing and precisely the way she did.

Trial Tr. at 851:1-14.

On the record, there is no reasonable probability that Worthan would have been

---

[7]  It is not clear whether this teacher is Ann's mother or the teacher who heard the allegations when Jane was upset because Ann told other girls about Jane's father. Trial Tr. at 783:5-785:11.

acquitted if only Dr. Scolatti had testified. It is impossible to conclude, as he now

argues, that he was prejudiced by Dr. Scolatti's absence from trial. This claim should

be denied.

## 2. Stube

As stated, Stube's appearance was a disaster. But this case demonstrates that

disaster does not establish ineffective assistance of counsel.

### a. Performance

#### (1) Facts

Before Sather was appointed as trial counsel, Worthan, Nancy, their attorney

in the DN case, and a "parent advocate" named Kandi Matthew-Jenkins[8] identified

Stube as a desirable expert witness. Postconviction Hr'g at 110:25-112:6. Stube told

Sather there was an issue with his Ph.D. degree, and Sather knew he did not have one.

She knew he "did everything he needed to do to have the Ph.D.," but there was "a

whole huge court – . . . case with this school not being accredited . . . during these

years, so anyone that got degrees during those years didn't have that." Id. at 34:13-

21. "[T]he way he described it to me was that it really wasn't a big issue and that had

been remedied and he had testified in courts since then. Judge Larson, in particular,

---

[8] Sather eventually reported Matthew-Jenkins to what was at the time the Montana Supreme Court's Commission on Unauthorized Practice of Law.

qualified him as an expert in numerous cases. And that's how he explained it to me."

Id. at 113:2-6.

Sather knew Stube had years of experience and had testified as an expert numerous times in western Montana in the same subject area of his proffered testimony in the Worthan case. She also knew that many people who have master's degrees, but not doctorates, testify as experts in child assessment. Postconviction Hr'g at 34:23-35:4. At the postconviction hearing, Sather was asked to explain her thinking on the degree issue:

> Q. Are you saying right now, though, that you went into trial thinking, I know this guy's Ph.D. is not as real as I thought it was, and yet I'm going to rely on the Court making a ruling that because of his experience he's an expert witness? You were relying on that?

> A. I don't remember thinking, Oh, his Ph.D. – That's not how he explained it to me. You know, it – I mean, granted, when he got on the stand, it was a lot wishy-washier than he had explained it to me. I did it from what he said, and I looked at his CV. So I didn't have the thought that you just said.

> Q. Right. In other words, you thought that he was an expert witness per his credentials, I mean his academic credentials?

> A. Whether it was master's or Ph.D., I thought he was qualified to testify on the issues that I was planning on having him testify on.
> . . .
>     I thought even with the master's and his education and experience he still qualified. So I didn't think of it as the issue that came up.

I mean I believe – Like I said, I haven't read the trial transcripts, but I think I tried to rehabilitate him after Mr. Fulbright questioned him, and I believe I argued to the Court that he was still qualified.

Id. at 35:8-25, 36:14-22. Sather said she "absolutely" would have appealed the issue had she remained on the case. Id. at 36:24-37:3.

On the stand at trial, Stube said things he did not say to Sather before trial. In particular, the problem with his degree was much bigger than mere lack of accreditation. After Stube described his credentials – untruthfully stating that he "completed a Ph.D. in 1998," Trial Tr. at 1150:16-17 – the prosecution introduced into evidence a permanent injunction from a California state court prohibiting Columbia Pacific University from operating. The school was required to notify everyone who received a degree after June 25, 1997, not only that it was not permitted to operate but that each student "had a right to obtain a full refund . . . of all course fees, tuition, application fees, enrollment fees, late booking fees, cancellation insurance, change of location fees, and any other fees you may have paid to Columbia Pacific University." Parenthetically, the notice added "'this means Columbia Pacific University must give you . . . back all of the money you paid to it.'" Trial Tr. at 1164:20-1165:4.

Stube testified he was notified of the shutdown but did not want a refund

because he "got a degree from these people." Id. at 1167:15-17. He said he "completed the doctorate work at the University of Montana," id. at 1170:17-18, though he obviously did not obtain their degree. He characterized the Ph.D. degree as "window dressing," id. at 1169:1, something he just did because his wife went back to graduate school, id. at 1167:20-1168:1. He said he did not need the degree to obtain licensing or national certification, id. at 18-19, and that "Judge Larson ruled that he had been listening to me ever since I had had a master's degree and that master's degree was fine with him," id. at1170:5-8.

Stube conceded he had "quite frequently" been challenged in court on the degree issue but "[m]ost of them" – presumably the lawyers who challenged him – "didn't have the data right," id. at 1170:5, and "don't find that it's Columbia Pacific University, and they just start going after any internet university that they think is appropriate," id. at 1169:8-11. Until Worthan's trial, no one had ever asked him about the notice he received of the court-ordered permanent injunction against his degree institution's operation. Id. at 1169:5-13. Though he knew there was an issue, he accepted a CPU official's representation that "it was all in the appeal courts and that it would be all cleared and that eventually this would all be set straight." Id. at 1171:22-24. He did nothing to follow up. Id. at 1170:20-1172:2. He concluded, "I never received a notice that the Ph.D. wasn't worth anything." Id. at 1172:1-2. The

20

court called a conference in chambers, and the jury was excused for the weekend.

On Monday morning, in chambers, the prosecution gave notice that it intended to call two rebuttal witnesses: Dr. Phil Bornstein,[9] "a clinical psychologist who is preparing to respond to . . . the clinical process Dr. Stube employs," and Dr. Nabil Haddad, "the chair of the Department of Psychology at the University of Montana . . . to rebut Mr. Stube's qualifications." Trial Tr. at 1199:9-18.

With Stube back on the stand in front of the jury, the prosecution asked him whether he did "a supervised pre-doctoral internship" that requires "2,000 hours to obtain the Ph.D." Trial Tr. at 1205:2-8. Stube responded, "I had to do three hours of supervised practice prior to getting my license in the State of Montana." He "did not do an APA internship." Id. at 1205:10-19. He did no postdoctoral supervised clinical work after he received his degree from Columbia Pacific. Id. at 1205:21-1206:22.

Suffice it to say that things degenerated from there. Each point Stube had asserted on Friday to support his qualifications, from the status of his Ph.D. to his report of Judge Larson's comment about his expertise, was shown to be significantly different than he represented. The most salient points: in 1983 or 1984, Stube was

---

[9] On Friday, Stube testified he "wrote a chapter with Dr. Phil Bornstein about assessment of the criminal personality that appeared in one of the major clinical psychology texts." Trial Tr. at 1152:14-19.

fired from a regional mental health center for misrepresenting himself as holding a master's degree before he actually did. And in December 1985, he was dismissed from a graduate study program at the University of Montana. Trial Tr. at 1204:9-1217:7. He still claimed to have received a master's degree from UM in 1986. Id. at 1215:14-25.

Eventually, because Stube apparently was, in fact, a licensed counselor in Montana, he was found qualified to offer opinion testimony on subject areas listed in Mont. Code Ann. § 37-23-102. Trial Tr. at 1220:2-1223:5. Sather and Stube were specifically instructed not to talk about Dr. Richard Gardner's criteria for distinguishing true from false allegations of sexual abuse. E.g., id. at 1179:12-1180:14, 1193:18-24, 1194:19-1195:19. Stube, in the course of describing the tests he administered to assess the girls' mental health and suggestibility, said, "After the suggestibility part of that, the mental health and suggestibility, I also looked at the allegation to see how it measured up following Dr. Richard Gardner's criteria for true and false sexual abuse –," id. at 1231:7-10. At that point, the court called another conference in chambers.

Sather was required to describe what Stube's testimony would be. She did, at length. Trial Tr. at 1235:18-1241:20, 1245:4-1247:4. Ultimately, the trial court found that Stube was "qualified to administer, score and interpret those instruments,"

22

that is, "the suggestibility scale test, the Piers-Harris self-concept scale," and so on.

Id. at 1245:18-25. But:

> He's not qualified to offer criticism of others who hold a different license who can talk about the administration and scoring and interpretation of those instruments in relation to human behavior. He does not have the human behavior component, at least in his field of training.
>
> So I will not allow him to go into any testimony that's going to directly or indirectly offer criticisms of Dr. Miller or Dr. Ruggiero. He's not qualified to. And everything I heard you talk about is implicitly a criticism of their techniques.

Trial Tr. at 1246:6-18. Sather protested that Stube was "qualified to assess and give tests and interpret those tests." Id. at 1246:19-21. The trial court responded:

> Well, I'm not going to let him testify unless he comes back into this court with the appropriate qualifications to talk in the context of human behavior. It appears to me he wants to do that without having the right licensure.
>
> Dr. Stube, you're dismissed as a witness.

Id. at 1246:22-1247:4. Sather requested a continuance to prepare a petition for writ of supervisory control, but her request was denied. When testimony resumed, Worthan took the stand. Id. at 1247:5-1249:3.

### (2) Analysis

The Montana Supreme Court held that Sather's performance was not unreasonable under the circumstances:

> As the District Court notes, prior to Stube testifying at trial, Sather met

23

with Stube, obtained and reviewed his curriculum vitae, discussed his Ph.D. degree with him and satisfied herself that Stube was a qualified expert witness. The record also indicates that Stube represented to Sather at the time of their meeting that he had been qualified as an expert witness on approximately fifty previous occasions. Furthermore, Stube's sworn testimony during the State's examination indicates that he glossed over or even mislead Sather as to the status of his Ph.D. While we are mindful of counsel's duty to conduct a reasonable investigation, we are satisfied that in this instance, Sather performed her duties in a manner consistent with her responsibilities as defense counsel. By meeting with Stube and reviewing what she thought to be his legitimate credentials, Sather performed her basic duties as defense counsel.

Worthan, 232 P.3d at 384-85 ¶ 20 (internal citation omitted).

Disastrous though Stube's appearance was, Sather's performance was not unreasonable under the circumstances. She interviewed him to determine whether he was qualified and whether he could be helpful to Worthan's case. Based on what he told her, she had no particular reason to inquire further into his credentials. As she put it, "It seemed my client wanted him, and the other thing is he seemed to be a good expert for my client, which there were other experts out there that weren't." Postconviction Hr'g Tr. at 32:13-15.

Further, in her attempt to salvage what she could of Stube's testimony, Sather pointed out that Dr. Ruggiero acted and testified as a counselor to the girls, and that was the area of Stube's licensure, Trial Tr. at 1236:9-25 – a bona fide legal argument in support of Stube's testifying. The trial court declined to allow a person with

Stube's qualifications to criticize Dr. Ruggiero. Id. at 1237:1-1241:20. On an abuse of discretion standard, another court might have found that Stube's significantly lesser qualifications went to the weight of his testimony, not to its admissibility. E.g., State v. Detonancour, 34 P.3d 487, 493-94 ¶ 48 (Mont. 2001) ("The degree of a witness's qualification affects the weight rather than the admissibility of the testimony."); Wacker v. Park Rural Elec. Co-Op., Inc., 783 P.2d 360, 361 (Mont. 1989) ("Whether the witness is an expert is a question of admissibility within the discretion of the trial court, but the degree of the expert's qualifications goes to the weight of the evidence and is a question for the jury."). Another court might also find that an expert who reached a different conclusion than Dr. Miller and Dr. Ruggiero was not necessarily "criticizing" their conclusions.

Under 28 U.S.C. § 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Montana Supreme Court's conclusion, Worthan, 232 P.3d at 384-85 ¶ 20, was a reasonable argument that Sather met the Strickland standard. Worthan fails to meet the first prong of the Strickland test.

### b. Prejudice

Although the Montana courts did not discuss prejudice, it is not supported on

the record.  Strickland prejudice requires a habeas petitioner to show a reasonable probability that, but for counsel's alleged error in calling Stube, he would have been acquitted.  A reasonable probability is a probability sufficient to undermine confidence in the jury's verdict.  466 U.S. at 693-94.

Worthan might show prejudice in one or both of two ways.  He might show a reasonable probability that he would have been acquitted if Stube had not been called at all.  On the existing record, he cannot do that.  It is prejudicial to the defendant, of course, when he builds a case around an expert witness and presents him to the jury, only to have him carom back and forth between needlepoint specificity and self-serving broadside as he bickers with opposing counsel over his qualifications.  But if Stube's appearance is lifted out of the record, all the other testimony remains just what it was at the time of trial.  It weighed strongly in favor of conviction.  Under the Strickland test, there is no reasonable probability that the jury would have found reasonable doubt if only Stube had not been called.

Alternatively, or in addition, Worthan might show a reasonable probability of acquittal if a qualified expert had testified in Stube's place.  Relying instead on the "ton of prejudice on the record," Postconviction Hr'g at 13:20; see also id. at 14:4-14, 159:21-160:11, Worthan did not point to or produce expert testimony that could support even the rather low Strickland standard of prejudice.  Dr. Scolatti was not that

expert, for the reasons set forth in Part III(B)(1).  Dr. Whitley, a pediatrician who

examined the children in February 2003, weeks before Jane's disclosure to Ann,

would have said only that he did not see physical signs of abuse.  Postconviction Hr'g

at 19:4-8, 27:23-28:2, 44:22-45:3.  There was already evidence in the record that

physical signs likely would not be apparent.  Id. at 44:23-24; Trial Tr. at 662:15-16,

680:18-682:8.  Neither girl testified that an incident of abuse occurred shortly before

Dr. Whitley saw them.  And the jury saw and considered Dr. Whitley's records of the

visit.  Trial Tr. at 1428:3-9.  There simply is no reason to suspect that Worthan could

have called at trial *any* expert whose testimony might have been compelling enough

to show prejudice under Strickland.[10]

It does not matter whether *Stube's* testimony might have created a reasonable

---

[10]  Even if such an expert existed, it would still be up to the jury to decide the
credibility and weight of that expert's testimony as against the State's expert and lay
witnesses.  Worthan "failed to develop the factual basis of [that] claim in State court
proceedings," 28 U.S.C. § 2254(e)(2).  There is no reason to suspect that one expert's
testimony could, under the circumstances here, amount to "clear and convincing
evidence that . . . no reasonable factfinder would have found the applicant guilty of
the underlying offense."  28 U.S.C. § 2254(e)(2)(B).  There is also no reason to
suspect that such an expert "could not have been previously discovered through the
exercise of due diligence."  Id. § 2254(e)(2)(A)(ii); Williams v. Taylor, 529 U.S. 420,
___ (2000).  But § 2254(e)(2) is moot because the Montana Supreme Court's decision
on the performance prong was reasonable under § 2254(d).  Cullen v. Pinholster, __
U.S. __, 131 S. Ct. 1388, 1400 (2011) ("If a claim has been adjudicated on the merits
by a state court, a federal habeas petitioner must overcome the limitation of §
2254(d)(1) on the record that was before that state court.").

probability of acquittal if he had given it. No one is entitled to present testimony from an unqualified expert. Worthan has never claimed the trial court violated his constitutional rights by finding Stube unqualified.

The Stube affair was not prejudicial in the only sense that matters under Strickland. Worthan's claim of ineffective assistance with regard to Stube's testimony should be denied because he shows neither deficient performance nor prejudice.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. Worthan's trial was far from perfect. Stube's testimony was, obviously, a disaster. But that is not enough to give substance to a claim of constitutional violations.

Worthan presented evidence, so there was no error in the prosecution's closing argument calling attention to the lack of evidence to corroborate his account. At any rate, the reference did not have a substantial effect on the verdict. His claims of ineffective assistance with respect to Dr. Scolatti and Stube would have some weight if either of those witnesses could have given material and favorable evidence, but the record shows that neither could. Therefore, Worthan can show neither that counsel

performed deficiently in failing to call them nor that he was prejudiced as a result. Finally, regarding his claim that he was prejudiced because counsel said in opening statement that she would call Dr. Scolatti but, in the end, she did not, Worthan still cannot show prejudice. Had Dr. Scolatti been called, there is no reason to believe his testimony would have been favorable enough to support a reasonable probability of an acquittal. The key witnesses in the case were the ones who actually knew whether Worthan committed the crimes or not: himself, the girls, and possibly their mother. All of those witnesses testified.

There is no substance to Worthan's attempts to show that his constitutional rights were violated. There is no reason to encourage further proceedings. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The Petition (doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Petitioner may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

<u>Worthan must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."</u> Failure to do so may result in dismissal of his case without notice to him.

DATED this  6th  day of May, 2011.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge